# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DR. WINSTON THOMPSON,    :
    Plaintiff,           :
                         :
v.                     :        CIVIL ACTION NO.
                         :        3:05-cv-715(JCH)
CONNECTICUT STATE    :
UNIVERSITY and          :
DR. ESTELA LOPEZ,     :
    Defendants.       :        DECEMBER 18, 2006

## RULING RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. NO. 18]

The plaintiff, Dr. Winston Thompson, brings this action against the defendants, the Connecticut State University System ("CSU") and Dr. Estela Lopez, for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e, et seq.; the right to contract under the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991 ("§ 1981"), 42 U.S.C. §1981; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq. and; the rights to equal protection and due process under the United States Constitution as secured by 42 U.S.C. § 1983.  Thompson also brings a state law claim for intentional infliction of emotional distress.  The jurisdiction of this court over Thompson's federal and state law claims is invoked under Title 28 of the United States Code, sections § 1331, 1343(3), 1367(a) and 2201(a); Title 42 of the United States Code, Section 2000e; and Title 29 of the United States Code, Sections 621-34.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendants have moved for summary judgment on all of Thompson's claims.  For the following reasons, the defendants' Motion for Summary Judgment (Doc. No. 18) is GRANTED in

part and DENIED in part.

## I.    STANDARD OF REVIEW

In a motion for summary judgement, the burden is on the moving party to
establish that there are no genuine issues of material fact in dispute and that it is
entitled to judgement as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once
the moving party has met its burden, the nonmoving party must "set forth specific facts
showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present
such evidence as would allow a jury to find in his favor in order to defeat the motion.
Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all
inferences in favor of the party against whom summary judgement is sought.
Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a
trial is properly granted only when no rational finder of fact could find in favor of the
non-moving party."  Carlton, 202 F.3d at 134.  "When reasonable persons, applying the
proper legal standards, could differ in their responses to the question" raised on the
basis of the evidence presented, the question must be left to the jury.  Sologub v. City
of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## II.    FACTS[1]

Thompson is a seventy-year old, African-American female who resides in

---

[1]For the purposes of the instant motion, the court accepts facts undisputed by the
parties as true and resolves disputed facts in favor of Thompson where she provides evidence
to support her allegations.

Connecticut.  For all times relevant to this action, she was employed by CSU in various capacities as a professional administrator.  CSU, which employees almost four thousand employees, is comprised of four state universities overseen by a Board of Trustees.  Lopez, a Latina, is a Connecticut resident who, beginning on April 19, 2002, served as CSU's Vice Chancellor for Academic Affairs.

Thompson began her employment with CSU on July 1, 1988, as Assistant Vice-President of Academic Affairs and Research.  Between 1998 and 2003, Thompson held various positions within the CSU system.  Thompson retired on July 1, 2003, from the position of Executive Officer for Academic Affairs and Research: Student Life & Student Learning.  In this position, Thompson was responsible for developing policies and programs for student life and student learning within the CSU system.  Also included within Thompson's job duties was coordinating a Global Majority Retreat for educators.

At an unspecified point during her CSU tenure, Thompson requested a standard sabbatical leave of absence in order to conduct academic research.  Thompson Aff. at ¶ 5.  However, CSU Chairman Larry McHugh insisted that Thompson not pursue her desired research.  Instead, as Cibes informed Thompson, McHugh preferred that Thompson manage the Global Majority Retreat.  Thompson Aff. at ¶ 7.  McHugh refused Thompson's requests to discuss her sabbatical itinerary.  Cibes also advised Thompson that McHugh would only grant Thompson a terminal sabbatical that would render her retired immediately following her sabbatical.  Thompson Aff. at ¶ 6.

On June 12, 2002, Thompson submitted a written proposal to the CSU Chancellor Dr. William Cibes for a paid, six-month terminal sabbatical to begin on January 1, 2003.  Local Rule 56(a)(1) Statement at ¶ 34.  Thompson's sabbatical would

3

be followed by her retirement beginning on July 1, 2003. Id. Cibes approved Thompson's request for a paid six month terminal sabbatical on July 19, 2002. Id. at ¶ 37. After Thompson obtained this terminal sabbatical, Lopez informed employees throughout the CSU system that Thompson was retiring because she was "tired." Thompson Aff. at 70. Around this same time period, Lopez denied Thompson's request to attend a teaching conference scheduled for February 2003 in Florida. Id. at 28; Thompson Dep. at 90.

On October 2, 2002, CSU publicly posted Thompson's former position as Executive Officer for Academic Affairs and Research. L. R. 56(a)(1) Stat. at ¶ 43.[2] Also, Lopez informed Thompson that CSU was going to advertise Thompson's former position. Thompson Aff. at ¶ 11. Although the job posting did not expressly indicate whether the position would be available as full or part time employment, CSU and Thompson shared the expectation that the position would be filled on a full time basis. See L. R. 56(a)(1) Stat. at ¶ 44; Thompson Aff. at ¶ 14. In addition to the job posting, CSU sent an email to everyone in its system on November 4, 2002, informing them that CSU intended to fill Thompson's former position as full time.

Eighty individuals applied for the advertised position after its posting. L. R. 56(a)(1) Stat. at ¶ 47. A search committee was then formed to evaluate the applicants and make a recommendation to Cibes. Four finalists for the position were interviewed in January 2003. During this process, CSU learned that the position could only be filled on a part-time basis due to budgetary constraints. Id. at ¶ 51. Lopez subsequently

---

[2]Plaintiff's Local Rule 56(a)(1) Statement will be cited as "L. R. 56(a)(1) Stat. at __" and the defendants' Local Rule 56(a)(2) Statement will be cited as "L. R. 56(a)(2) Stat. at __."

informed the finalists that the position would only be for part-time employment and inquired as to whether they were still interested.  Id. at 52.  No one at CSU informed Thompson that her former position would be available as a part-time position. Thompson Aff. at 17, 20.  Before leaving on sabbatical, Thompson never expressed any interest in working in a part-time position.  Local Rule 56(a)(1) Statement at ¶ 54. However, Thompson claims that she would have been interested in applying for her former position had she known CSU was offering it as a part-time position.

Based on the search committee's recommendations, Lopez ultimately hired Dr. Peter Rosa, a younger, Latino retiree from another CSU Department.  Dr. Rosa has since left this position, which remains vacated.

Thompson claims that Lopez took a number of adverse actions against her in addition to preventing Thompson from applying to her former position as a part-time administrator.  One of these allegations is that Lopez evaluated black employees in the department more poorly than non-black employees, jeopardizing their promotions and employment opportunities.  Another claim is Lopez would loudly yell and mispronounce Thompson's name as "Viniston" when Thompson would walk past Lopez's office.  On numerous occasions, Thompson requested that Lopez stop yelling in this manner, but the behavior continued.  Thompson also states that Lopez would interrupt conversations between Thompson and Latino colleagues by speaking to the Latino colleague in Spanish, giving the impression that Latino employees were more highly valued.

In addition to Lopez's discriminatory treatment of Thompson, Thompson claims that Lopez treated other African-American employees in a discriminatory manner.

5

Three of these African-American employees filed complaints with the Connecticut Commission on Human Rights and Opportunities ("CHRO").  According to Thompson, Lopez's actions led Thompson to provide other African Americans working under Lopez with emotional support.

On or about November 17, 2003, Thompson filed her own CHRO complaint alleging discrimination in failing to hire on the basis of race, color, gender, and age. Thompson withdrew the complaint on November 17, 2004, in order to pursue the matter in federal court.  Ex. 30 to Def. Mem. In Support.  On February 10, 2005, the Equal Employment Opportunity Commission ("EEOC") issued Thompson a "Notice of Right to Sue" letter.

## III.    DISCUSSION

### A.    Administrative Exhaustion of Title VII Claim

The defendants first argue that Thompson has not exhausted her administrative remedies under Title VII because, after withdrawing her complaint with the CHRO, she did not request or obtain a right to sue letter from the United States Attorney General. According to the defendants, the plain language of 42 U.S.C. § 2000e-5(f)(1) requires a right to sue letter from the Attorney General because CSU is a state governmental agency within the meaning of the statute.  While the defendants admit that Thompson has obtained a right to sue letter from the EEOC, they maintain that the EEOC's letter does not abrogate the statute's requirement of a letter from the Attorney General in cases involving governmental agencies.

The court finds that the defendants' position rests on an untenable reading of 42

U.S.C. § 2000e-5 and the facts of this case.  The relevant language upon which the

defendants' interpretation hinges reads as follows:

> In the case of a respondent which is a . . . governmental agency . . . if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against the respondent in the appropriate United States district court . . . . If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or within one hundred and eighty days from the filing of such charge . . . the Attorney General has not filed a civil action in a case involving a . . . governmental agency . . . the Commission, or the Attorney General in a case involving a . . . governmental agency . . . shall so notify the person aggrieved . . . and a civil action may be brought against the respondent named in the charge by the person claiming to be aggrieved.

42 U.S.C. § 2000e-5(f)(1).  The defendants' assertion that Thompson could only come

to federal court if her notice of the right to sue was issued by the Attorney General

ignores a key provision in the excerpted language: the only explicit obligation of the

Commission to forward a case to the Attorney General arises where the Commission

"has been unable to secure from the respondent a conciliation agreement acceptable to

the Commission."  Id.  Under 42 U.S.C. § 2000e-5(b), the Commission only attempts to

obtain a conciliation agreement where it "determines after such investigation that there

is reasonable cause to believe that the charge is true."  Thus, in Thompson's case,

where there has been no finding of reasonable cause by the Commission, the

Commission has no statutory obligation to forward the matter to the Attorney General.

Moreover, where the Commission has not found reasonable cause, "it shall dismiss the

charge and promptly notify the person claiming to be aggrieved . . . of its action."  42

U.S.C. § 2000e-5(b).  This quoted section of 42 U.S.C. § 2000e-5(b) makes no

distinction between cases involving private parties and cases involving governmental

7

entities.

Considering this statutory language, it is difficult to imagine why, in a case like Thompson's case, the Attorney General would issue a right to sue letter where the Commission never made a finding of reasonable cause and independently issued a right to sue letter to the alleged aggrieved party.  It is even more difficult to imagine why the Commission, having made no finding of reasonable cause, would even notify the Attorney General of the complaint at issue.  But perhaps the most confounding implication of the defendants' argument is why a plaintiff, who by the plain language of the statute is entitled to a right to sue letter from the EEOC, and who requests and receives said letter from the EEOC, would then have to make an *additional* request to the Attorney General in order to have her case heard in federal court.  The defendants cite to nothing in the statute that would compel this outcome.[3]

The EEOC's own regulations support this interpretation of Title VII.  Under those regulations, "[i]n all cases where the respondent is a . . . governmental agency . . . the Commission will issue the notice of the right to sue when there has been a dismissal of a charge."  29 C.F.R. § 1601.28(d).  This language reflects a 1980 agreement between the Justice Department and the EEOC that, "[t]he Attorney General will issue [notices of right to sue letters] only when the EEOC finds probable cause, conciliation efforts fail, and the EEOC refers the case to the Justice Department, but the Attorney General

---

[3]Had Thompson actually requested a right to sue letter from the Attorney General, it appears she would have been entitled to one.  See 29 C.F.R. § 1601.28(d)(2) (stating that the Attorney General will issue the notice of the right to sue where a charging party requests such notice under Section 1601.28(a)(2)).  However, Thompson's ability to obtain a right to sue letter from the Attorney General does not a statutory requirement make.

decides not to pursue the action." Dougherty v. Barry, 869 F.2d 605, 612 (D.C. Cir.

1989) (citing 29 C.F.R. § 1601.28(d)(1) and Letter from Assistant Attorney General

Drew S. Days III to Eleanor Holmes Norton, Chair, EEOC (Mar. 17, 1980), reprinted in

45 Fed.Reg. 48, 617-18 (1980)).

The defendants alternatively assert that the EEOC's regulations require the

conclusion that the Attorney General had to issue the right to sue letter in Thompson's

case.  In their view, the EEOC can only dismiss a charge for one of the reasons set

forth in 29 C.F.R. § 1601.18, and that none of the circumstances set forth in that

regulation are present here.  Further, the defendants assert that the EEOC never made

the determination of reasonable cause that would have entitled it to issue a right of sue

notice under 29 C.F.R. § 1601.19.  The court rejects both of these assertions.  As the

foregoing discussion indicates, the Attorney General would have issued a right to sue

letter in this case only if the EEOC had previously found reasonable cause.  Because

Thompson withdrew her CHRO complaint and the EEOC subsequently issued a right to

sue letter without further investigation, the EEOC clearly did not make a finding of

reasonable cause.  Even if the EEOC was somehow mistaken in issuing a right to sue

letter in this case, Thompson's reliance on the EEOC's improper actions would almost

certainly merit equitable waiver.  See Zipes v. Trans World Airlines, Inc., 455 U.S. 385,

393 (1982).

> **B.**    **Title VII Hostile Work Environment Theory**
>
> 1.    Timeliness of Thompson's Hostile Work Environment Claim

The defendants next attack Thompson's Title VII hostile work environment claim

by arguing that it is time-barred under National R.R. Passenger Corp. v. Abner Morgan,
536 U.S. 101 (2002).  According to the defendants, Thompson's 300-day filing period
under Title VII began to run when Thompson began her sabbatical on January 1, 2003.
Thompson did not file her CHRO complaint until November 17, 2003, roughly 330 days
after she last actively worked for Lopez.  Implicit in the defendant's argument is the
notion that Thompson cannot rely on any of the defendants' actions against her which
occurred after she went on sabbatical.  However, the defendants have admitted two of
their alleged acts - namely, denying Thompson permission to travel to the Florida
conference in February 2003 and their refusal to hire Thompson after July 1, 2003 -
occurred within the 300-day filling period.  Mem. in Supp. at 15.  Neither of these
alleged acts must be actionable in its own right to constitute a part of Thompson's
hostile work environment claim.  Morgan, 536 U.S. at 116.  Moreover, "[p]rovided that
an act contributing to the claim occurs within the filing period, the entire period of the
hostile work environment may be considered by a court for the purposes of determining
liability."  Id. at 117.  Based on the defendants' admission and Morgan, the court holds
that Thompson is not barred by the statute of limitations from asserting her Title VII
hostile work environment claim.

       2.     Sufficiency of Thompson's Hostile Work Environment Claim

To prevail on a hostile work environment claim under Title VII, a plaintiff must
establish that her workplace was "permeated with discriminatory intimidation, ridicule,
and insult that is sufficiently severe or pervasive to alter the conditions of the victim's
employment and create an abusive working environment."  Harris v. Forklift Systems,
Inc., 510 U.S. 17, 21 (1993) (citations omitted).  In Harris, the Supreme Court outlined a

two part test for proving a hostile work environment.  The first part of the test asks

whether the conduct in question was objectively hostile or, in other words, whether the

employer's actions created "an environment that a reasonable person would find hostile

or abusive."  Harris, 510 U.S. at 21.  Determining whether the work environment was

objectively hostile is accomplished by examining the totality of the circumstances.

Williams v. County of Westchester, 171 F.3d 98, 100 (2d Cir. 1999).  A nonexclusive list

of the factors a court may consider includes, "the frequency and severity of the

discriminatory conduct, whether such conduct is physically threatening or humiliating,

and whether the conduct unreasonably interferes with the plaintiff's work performance."

Williams, 171 F.3d at 100 (citing Harris, 510 U.S. at 23).  No single factor is required or

dispositive.  Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 605 (2d Cir. 2006).

If the plaintiff can make this showing, she must then satisfy the court that she

subjectively perceived the work environment as abusive.  Id. at 21-22.  The

demonstrated effects that the work environment had on the plaintiff's mental well being

are very pertinent to deciding whether the plaintiff actually viewed his surroundings as

intolerable.  Id. at 23.

By and large, a plaintiff cannot establish a hostile work environment if the

incidents complained of are isolated, unless those incidents "are of sufficient severity to

alter the terms and conditions of employment."  Demoret v. Zegarelli, 451 F.3d 140, 149

(2d Cir. 2006) (citing Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004).

In addition, the Second Circuit has made explicit the Supreme Court's underlying

requirement that a plaintiff must adduce "a specific basis for imputing the conduct

creating the hostile work environment to the employer."  Feingold v. New York, 366 F.3d

11

138, 150 (2d Cir. 2004) (citing <u>Alfano v. Costello</u>, 294 F.3d 365, 373 (2d Cir. 2002).

The question of whether a work environment is hostile under Title VII and section 1983 is primarily one of fact.  <u>See</u> <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 75 (2d Cir. 2001).  Thus, the court's role on a motion for summary judgment is inherently limited.  It must limit itself to deciding only "whether a reasonable factfinder could conclude . . . that the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*."  <u>Schiano</u> 445 F.3d at 600 (quoting <u>Whidbee v. Garzarelli Food Specialists, Inc.</u>, 223 F.3d 62, 70 (2d Cir. 2000)).  As the Second Circuit has cautioned, "[a]n Article III judge is not a hierophant of social graces," and there is no defensible justification for the belief that courts are superior to juries in demarcating the boundary between merely inappropriate conduct and legally abusive racism.  <u>See</u> <u>Gallagher v. Delaney</u>, 139 F.3d 338, 347 (2d Cir. 1998).

In light of the Second Circuit's clear preference for a jury determination of whether a plaintiff experienced a hostile work environment and the evidence adduced by Thompson with regards to her experience at CSU, the court finds that there is a material issue of fact as to whether the defendants subjected Thompson to a hostile work environment.

### C.    Title VII Intentional Discrimination Theory

Analyzing whether the defendants subjected Thompson to intentional discrimination in preventing her from re-applying for her former position on a part-time basis must be done under the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See</u> <u>Fitzgerald v. Henderson</u>, 251 F.3d 345, 356 (2d Cir.

2001).  The plaintiff is first required to establish a prima facie case of discrimination.

See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  A prima

facie case for disparate treatment is established by showing that, 1) the plaintiff is a

member of a protected class; 2) the plaintiff performed her job adequately; 3) the

plaintiff suffered an adverse employment action; and 4) that the adverse employment

action occurred under conditions giving rise to an inference of discrimination.  Burdine,

450 U.S. at 254.

Once a plaintiff has established a prima facie case, a rebuttable presumption of

discrimination arises, and the burden shifts to the defendant to offer a legitimate,

non-discriminatory reason for its actions. See id.  Upon the employer's articulation of a

nondiscriminatory reason for the employment action, the presumption of discrimination

that arises with the establishment of the prima facie case drops out.  See  St. Mary's

Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).  The burden then shifts back to the

plaintiff to fulfill her ultimate burden of proving that the defendant intentionally

discriminated against him in the employment action.  Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 143, (2000).  In order to satisfy this burden, the plaintiff may

attempt to prove that the legitimate, non-discriminatory reason offered by the defendant

was not the employer's true reason, but was a pretext for discrimination.  Id.

A prima facie case combined with a showing that an employer's asserted

justification is false is sometimes, but not always, sufficient to permit a discrimination

claim to survive summary judgment. Schnabel v. Abramson, 232 F.3d 83, 89-91 (2d Cir.

200) (citing Reeves, 530 U.S. at 142).  The court must "examin[e] the entire record to

determine whether the plaintiff could satisfy her 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " Schnabel, 232 F.3d at 90 (quoting Reeves, 530 U.S. at 143, 120 S.Ct. 2097).  The plaintiff need not show that sex or race was the only factor motivating any adverse employment actions she suffered in order to make a showing of employment discrimination. See 42 U.S.C. § 2000e-2(m); Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).  "The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason," regardless of whether the case is presented as one of single or dual motive.  Stratton v. Dep't for the Aging for New York, 132 F.3d 869, 878 (2d Cir.1997).

The defendants' main argument is that Thompson cannot create a material issue of fact on the "ultimate issue" of whether the defendants' failure to inform Thompson of the part-time opening gives rise to an inference of intentional discrimination.  They first claim that, because Thompson never applied for or expressed an interest in working part-time after her retirement, the defendants did not have a duty to inform her of the opening.  They also note that, initially, CSU fully intended to offer Thompson's position as a full-time position but, due to budget cuts, did not have the funds to hire a full-time Executive Officer for Academic Affairs.  Local Rule 56(a)(1) Statement at ¶ 51.  Rosa was subsequently hired for the position because he was willing to accept part-time employment and was, in the selection committee's opinion, the top applicant for the position.  Id. at ¶ 53.  The defendants next assert that of three retirees that CSU

14

rehired, three were asked to return in order to complete specific projects that were already underway.  Id. at ¶¶ 64-66.  The plaintiff, by contrast, would have had no such specific project to complete after her sabbatical.  A fourth employee who was placed on terminal sabbatical like the plaintiff was also not rehired.  Id. at 67.  Lastly, the defendants point out that, unlike Thompson, none of employees that were rehired worked for departments that reported directly to Lopez, meaning that Lopez did not actually make the decision to rehire them.

Thompson has come forward with no evidence beyond that which makes out her prima facie case of disparate treatment.  In no way does she rebut what the court finds to be the defendants' legitimate business reasons for not informing her that her former position would be offered as part-time employment.  Looking to the record as a whole, the court concludes that Thompson has not presented sufficient evidence to create a material issue of fact on whether the defendants intentionally discriminated against her. Therefore, the court grants summary judgment on Thompson's intentional discrimination theory in Count One.

**D.      Section 1983 Equal Protection Claim**

1.      Due Process

In Count Four of Thompson's Complaint, she alleges that, in discriminating against Thompson for exercising her First Amendment rights, the defendants deprived her of equal protection under the law by denying her the right to due process. Complaint at ¶ 82.  Neither party specifies the protected speech at issue.  Instead, the parties focus on whether Thompson had a protected property interest in her former

position.  See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569-70

(1972).

Thompson's arguments for why she had a protected interest in her former

position largely mirror her Title VII claims for intentional discrimination.  See Mem. in

Opp. at 23.  However, Thompson cites no authority for the proposition that she had a

protected interest in a former position to which she did not apply by virtue of the fact

that she was qualified for the position and prevented from applying by intentional

discrimination.  Thompson also does not direct the court to any existing rules or

understandings under state law or CSU regulations that would entitle her to notice that

her former position was being offered as part-time employment.  See Roth, 408 U.S. at

577.  In sum, this court finds that Thompson has not shown that she had anything more

than "an unprotected unilateral expectation of employment."  See Donato v. Plainview

Old Bethpage Center Sch. Dist., 96 F.3d 623, 629 (2d Cir. 1996).

      2.      Selective Enforcement/Class of One Equal Protection Theory

Thompson's equal protection claim in Count Four is premised on theories of

selective enforcement and "class of one" treatment.  The court will address these

theories in turn.

In order to establish an equal protection violation based upon selective

enforcement, the plaintiff must prove that, "(1) in comparison with others similarly

situated, she was selectively treated, and (2) that such selective treatments was based

on impermissible considerations such as race, religion, intent to inhibit or punish the

exercise of constitutional rights, or malicious or bad faith intent to injure a person."

Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir. 2000) (quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)).  The court finds that Thompson fails to create a material issue of fact on the first prong of the selective treatment test because she has not come forward with evidence that similarly situated CSU employees were treated differently from her.  As discussed above, the individuals that Thompson claims were allowed to return to CSU after retiring each worked in a department that did not report directly to Lopez.  As such, these individuals were not "similarly situated in all material respects" to Thompson for the purposes of her equal protection claim.  See Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997).  Thompson's inability to show that she was treated in a manner different similarly situated employees also forecloses recovery under a "class of one" theory.  See  Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005) (citing Purze v. Village of Winthrop Harbar, 286 F.3d 452, 455 (7th Cir. 2002) (holding that a plaintiff's burden on a "class of one" claim is "extremely high," and a plaintiff cannot prevail absent a prima facie showing that she is identical in all relevant respects to the individuals with whom she compares herself).

Given that Thompson has not come forward with sufficient evidence to create a material issue of fact on any of her theories of recovery under equal protection, the court grants summary judgment on Count 4.

### E.    Age Discrimination in Employment Act

The defendants claim that Thompson's cause of action under the ADEA is barred by the Eleventh Amendment because she only seeks money damages.  The court agrees.  While the plain language of the ADEA unequivocally evinces Congress'

17

intent to subject the states to suit for money damages at the hands of private citizens, the Supreme Court and Second Circuit have just as clearly held that the ADEA's abrogation of state sovereign immunity is invalid.  Kimel v. Florida Board of Regents, 528 U.S. 62, 91 (2000); McGinty v. New York, 251 F.3d 84, 91-92 (2d Cir. 2001).  As Thompson does not contend that Connecticut has waived sovereign immunity in this suit, and the court does not find a basis for such waiver, the court grants the defendants' motion for summary judgment on Thompson's ADEA claim in Count Three. See McGinty, 251 F.3d at 92.

### G.     Section 1981 Claims

The defendants challenge Thompson's claims under Section 1981 in Count Two by asserting that Section 1983 is Thompson's exclusive federal remedy for any violation of the right to contract.  Thompson does not contest this assertion.  Based on the reasoning in caselaw in this district, the court finds that Thompson cannot maintain a cause of action under Section 1981 for her violation of the right to contract claim.  See Burbank v. Office of Atty. Gen. of State of CT, 240 F.Supp.2d 167, 175 (D.Conn. 2003).

### H.     Qualified Immunity

The court next addresses the defendants' claim that qualified immunity shields Lopez from individual liability for the federal violations alleged in this suit.  Generally, qualified immunity insulates government officials from personal liability when they perform discretionary duties pursuant to their official functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

18

The threshold question in determining whether a government actor's actions warrant qualified immunity is "whether the plaintiff's version of the facts show[s] the officer's conduct violated a constitutional right." Demoret v. Zegarelli, 451 F.3d 140, 148 (2d Cir. 2006) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001). If, after construing the parties' submissions in favor of the plaintiff, the court concludes that the defendant did not violate any of the plaintiff's constitutional or statutory rights, the inquiry ends and the relevant counts are dismissed. Saucier, 533 U.S. at 201. But, if "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id. If the right was clearly established, government officials are entitled to qualified immunity "only if [s]he can show that, viewing the evidence in the light most favorable to plaintiffs, no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law." Demoret, 451 F.3d at 148 (citing Moore v. Vega, 371 F.3d 110, 114 (2d Cir. 2004)).

In arguing for qualified immunity, the defendants assert in conclusory fashion that there is no evidence that Lopez acted in bad faith or with knowledge that her conduct violated clearly established law. In addition, the defendants advance the notion that legitimate business decision are immune from suit. The court has already found that Thompson has created a material issue of fact only on her Title VII claim based on a hostile work environment. As the court finds that the law on Title VII recovery for hostile work environments is clearly established and that a reasonably jury could conclude that the defendants acted unreasonably in light of this clearly established law, the court rejects the defendants' assertion of qualified immunity.

19

**H.      Intentional Infliction of Emotional Distress**

Under Connecticut law, to establish a claim of intentional infliction of emotional distress, a plaintiff must plead and prove that, (a) defendants intended to inflict emotional distress, or knew or should have known that emotional distress was a likely result of their conduct; (b) defendants' conduct was extreme and outrageous; (c) defendants' conduct caused the plaintiff's distress; and (d) the emotional distress sustained by the plaintiff was severe. Appleton v. Bd. of Educ. of Stonington, 254 Conn. 205, 210 (2000) (citing Petyan v. Ellis, 200 Conn. 243, 253 (1986)). The standard in Connecticut to demonstrate extreme and outrageous conduct is stringent. Huff v. West Haven Bd. of Educ., 10 F.Supp.2d 117, 122 (D.Conn.1998). " '[E]xtreme and outrageous' conduct is defined as that which 'exceed[s] all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.' " Id. (quoting DeLaurentis v. New Haven, 220 Conn. 225, 267 (1991)).

The closest Thompson comes to offering evidence that might create a material issue of fact on whether Lopez's behavior was "extreme and outrageous" is that Lopez would loudly mispronounce Thompson's first name as "Viniston," and that Lopez often interrupted Thompson's conversations with Spanish speaking CSU employees by speaking in Spanish.  Considered in tandem or separately, these allegations do not, as a matter of law, arise to intentional infliction of emotional distress under Connecticut law.  The court therefore grants summary judgment on Thompson's claim for intentional infliction of emotional distress in Count Five.

20

**VII.    CONCLUSION**

For the foregoing reasons, the defendants' Motion for Summary Judgment  (Doc. No. 18) is GRANTED in part and DENIED in part.  It is DENIED as to Thompson's hostile work environment theory of recovery under Title VII in Count One.  It is GRANTED on all other grounds.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 18th day of December, 2006.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge